**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**WHEELING**

**DARRELL WAYNE MOSS,**

        Plaintiff,

**v.**

        **CIVIL ACTION NO.: 5:16-CV-47**
        **(STAMP)**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**

        Defendant.

## REPORT AND RECOMMENDATION

## I.   INTRODUCTION

On April 8, 2016, Plaintiff Darrell Wayne Moss ("Plaintiff"), through counsel Jan

Dils, Esq., filed a Complaint in this Court to obtain judicial review of the final decision of

Defendant Carolyn W. Colvin,[1] Acting Commissioner of Social Security ("Commissioner"

or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42

U.S.C. § 405(g) (2015). (Compl., ECF No. 1). On June 15, 2016, the Commissioner,

through counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an

Answer and the Administrative Record of the proceedings. (Answer, ECF No. 6; Admin.

R., ECF No. 7). On August 15, 2016, and October 14, 2016,[2] Plaintiff and the

Commissioner filed their respective Motions for Summary Judgment and supporting

briefs. (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 12; Def.'s Mot. for Summ. J.

---

[1] The undersigned notes that, on January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security.

[2] On September 20, 2016, the Commissioner requested an additional thirty days in which to file her Motion for Summary Judgment, which was granted. (Mot. Out of Time to File for an Extension of Time, ECF No. 14; Order Granting Def.'s Mot. to Enlarge Time, ECF No. 15). Therefore, the Commissioner's Motion was timely filed.

("Def.'s Mot."), ECF No. 16). On October 17, 2016, Plaintiff filed a Reply to the Commissioner's brief. (Pl.'s Reply to Def.'s Mot. for Summ. J. ("Pl.'s Reply"), ECF No. 17). The matter is now before the undersigned United States Magistrate Judge for a Report and Recommendation to the District Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and LR Civ P 9.02(a). For the reasons set forth below, the undersigned finds that the Commissioner erred at step three of the sequential evaluation process and recommends that the matter be remanded for further proceedings.

## II. PROCEDURAL HISTORY

On June 22, 2012, Plaintiff protectively filed a Title II claim for disability insurance benefits ("DIB") and a Title XVI claim for supplemental security income ("SSI") benefits, alleging disability that began on September 18, 2005. (See R. 11, 73, 267). However, Plaintiff subsequently amended his alleged onset date to February 1, 2010. (R. 11, 267). Plaintiff's claim was initially denied on January 15, 2013, and denied again upon reconsideration on April 15, 2013. (R. 133, 147). After these denials, Plaintiff filed a written request for a hearing. (R. 11, 161).

On September 17, 2014,[3] a video hearing was held before United States Administrative Law Judge ("ALJ") John T. Molleur in Charleston, West Virginia. (R. 11, 19, 27). Nancy Shapero, an impartial vocational expert, appeared and testified in Charleston. (R. 11, 27). Plaintiff, represented by Yvonne M. Costelloe, Esq., of Jan Dils Attorneys at Law, L.C., appeared and testified in Parkersburg, West Virginia. (Id.). On October 24, 2014, the ALJ issued an unfavorable decision to Plaintiff, finding that he was not disabled within the meaning of the Social Security Act. (R. 8). On February 11,

---

[3] The video hearing was originally scheduled for July 14, 2014 (R. 180) but was rescheduled after Plaintiff requested a continuance, stating that he had been diagnosed with "a large cancerous mass on his kidney" and would be undergoing surgery that day. (R. 201-02).

2016, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (R. 1).

### III. BACKGROUND

**A. Personal History**

Plaintiff was born on February 1, 1966, and was forty-six years old at the time he filed his claim for benefits. (See R. 73). He is 5'10" tall and weighs approximately 260 pounds. (R. 277). He is divorced and lives alone in a mobile home. (R. 36, 289). He has completed high school but has not received any specialized, trade or vocational training. (R. 278). His prior work experience includes working as a construction worker.[4] (R. 48). He alleges that he is unable to work due to the following ailments: (1) injuries in his lower back, neck, shoulder and left foot; (2) memory loss and (3) depression, anxiety and nightmares. (R. 277).

**B. Medical History**

**1. Medical History Pre-Dating Alleged Onset Date of February 1, 2010**

On September 25, 2005, Plaintiff presented to a hospital in Florida, stating that he fad "[fallen ten] feet from [a] second floor accidentally where a spiral staircase was supposed to be." (R. 918-21). Plaintiff further stated that he had "landed on his left heel." (Id.). Plaintiff was diagnosed with a left heel fracture and underwent surgery, in which hardware was inserted into his left foot. (Id.). On June 13, 2006, Plaintiff underwent a second surgery, in which the hardware was removed from his left foot. (R. 916).

---

[4] On April 15, 2014, Plaintiff submitted a form entitled Claimant's Work Background, in which he states that he has worked for National Carports, B&M Construction and M&M Metal Stud Framing. (R. 329).

On January 15, 2008, Plaintiff presented to the Back Authority for Contemporary Knowledge ("B.A.C.K.") Center, complaining of back pain. (R. 359). Based on prior MRI results, Plaintiff was diagnosed with: (1) neck pain with left upper extremity radiculitis; (2) a herniated nucleus pulposus at C6-C7; (3) low back pain with lower extremity pain and (4) degenerative disk disease of the lumbar spine at L4-L5 and L5-S1. (R. 360). To treat his back pain, Plaintiff was referred for an epidural consultation. (Id.). Plaintiff presented to his consultation on February 12, 2008, and subsequently received a total of five epidural injections throughout February and March of 2008. (R. 352-57). On April 15, 2008, during a follow-up appointment at the B.A.C.K. Center, Plaintiff estimated that his back pain had improved forty percent. (R. 350).

On September 11, 2008, Plaintiff returned to the B.A.C.K. Center, complaining of continuing back pain. (R. 348). After an examination, it was recommended that Plaintiff undergo an anterior cervical discectomy and fusion. (Id.). However, due to financial constraints, Plaintiff did not receive the surgery. (See id.). On June 23, 2009, Plaintiff again returned to the B.A.C.K. Center and was instructed to continue pain management for his back pain, which included taking ibuprofen and hydrocodone. (R. 345).

**2. Medical History Post-Dating Alleged Onset Date of February 1, 2010**

In early July of 2010, Plaintiff was involved in a motor vehicle accident, after which he suffered neck and low back pain. (R. 395). Therefore, on July 30, 2010, Plaintiff presented to Marietta Memorial Hospital's Spine Center for a neurosurgical consultation. (R. 400). Rammy Schmuel Gold, M.D., performed the consultation. (Id.). After the consultation, Plaintiff was accepted as a patient of the Spine Center. (Id.). Subsequently, Dr. Gold ordered MRIs of Plaintiff's cervical and lumbar spines. (R. 395,

400, 418). The MRI results of Plaintiff's cervical spine showed "[m]oderate to prominent degenerative changes . . . causing moderate spinal stenosis." (R. 418). The MRI results of Plaintiff's lumbar spine showed moderate degenerative changes. (R. 395). Due to Plaintiff's cervical spine MRI results, Dr. Gold scheduled Plaintiff for an anterior cervical discectomy and fusion. (See R. 377, 400). Dr. Gold recommended conservative treatment for Plaintiff's lumbar spine and, if that failed, a lumbar discogram. (R. 623).

On September 3, 2010, Dr. Gold performed Plaintiff's neck surgery. (R. 377). After the surgery, Plaintiff stated that he was "healing well" but was suffering from "some residual symptoms." (R. 400). Plaintiff was referred to physical therapy, in which he participated for two visits "but thought that it hurt more so he stopped." (Id.). Plaintiff was discharged as a patient from the Spine Center on December 3, 2010, but was ordered to continue treatment with Dr. Gold through the PARS Brain & Spine Institute.[5] (Id.).

On May 27, 2011, Plaintiff presented to the office of Joann Nutter, a nurse practitioner, to establish as a primary care patient. (R. 528). During this visit, Ms. Nutter noted that Plaintiff "ha[d] gone to [F]lorida for care" but that he had returned to the area and required a primary care provider. (Id.). Ms. Nutter listed, *inter alia*, the following as Plaintiff's diagnoses: degenerative joint disease of cervical spine, neck pain, chronic lower back pain, anxiety, migraines and gout. (Id.). Ms. Nutter documented that Plaintiff receives treatment for his back from Kalapala S. Rao, M.D. (Id.). Ms. Nutter further documented that Plaintiff's prescriptions included: Flexeril for muscle spasms, Norco and Midrin for pain and Xanax for anxiety.[6] (R. 528-29).

---

[5] Dr. Gold is affiliated with both Marietta Memorial Hospital's Spine Center and the PARS Brain & Spine Institute. (See R. 400).
[6] The record includes treatment notes from Royal Oaks Medical Center, located in Florida. (See, e.g., R. 446). It appears from the record that Plaintiff, although residing in West

On July 28, 2011, Plaintiff presented to the offices of Mario R. Schwabe & Associates, PLLC, for a comprehensive psychiatric evaluation. (R. 566). During the evaluation, Plaintiff stated that he suffers from anxiety and nightmares. (Id.). After the evaluation, Plaintiff was instructed to stop taking Xanax and was instead prescribed Valium and Cymbalta for his anxiety and Minipress for his nightmares. (R. 567). It was noted that Plaintiff's prognosis was good. (Id.). After this visit, Plaintiff routinely returned to Mario R. Schwabe & Associates for mental health care and treatment. (R. 564-66, 902-915, 1013-18).

On October 5, 2011, Plaintiff presented to PARS for a one-year post-operative appointment. (R. 642). During this appointment, Plaintiff stated that his neck pain had initially improved after his surgery but that it had since returned and was continuing to worsen. (Id.). Plaintiff further stated that he was experiencing incoordination and loss of balance. (Id.). It was noted that Plaintiff was in the process of getting a transcutaneous electrical nerve stimulation ("TENS") unit for his pain.[7] (Id.). Subsequently, X-rays of Plaintiff's cervical and lumbar spines were ordered. (R. 595-98). The X-ray results of Plaintiff's cervical spine were largely normal. (R. 595). However, the X-ray results of Plaintiff's lumbar spine showed:

1. Straightening of the normal lumbar lordosis suggesting muscle spasm.
2. Mild multilevel degenerative disc disease with desiccation and diffuse disc bulging at L4-L5 and L5-S1.
3. There is a small left foraminal disc protrusion at L5-S1 which abuts the exiting left L5 nerve root.

---

Virginia, traveled to Florida frequently for prescription refills, including prescriptions for Flexeril, Norco and Xanax. (Id.). In other words, Plaintiff was receiving these medications from two different care providers at the same time for some period of time in 2011.

[7] On April 10, 2012, it was documented that Plaintiff had "tried a [TENS] unit." (R. 612). The reason the TENS unit was stopped is not explicitly stated.

(R. 597-98).

On January 4, 2012, Plaintiff returned to PARS for a follow-up appointment. (R. 660). Because Plaintiff continued to complain of neck pain, Dr. Gold ordered that Plaintiff undergo electromyography. (Id.). The results of the electromyography showed:

- Chronic right cervical or cervicothoracic polyradiculopathy at C7, C8 and possibly T1 . . . [with] chronic denervation . . . .
- Chronic left C8 radiculopathy or C8/T1 polyradiculopathy . . . [with] chronic denervation . . . .
- Probable superimposed chronic C3 or C4 radiculopathy . . . [with] chronic denervation . . . .

(Id.). During a subsequent follow-up appointment on March 27, 2012, Dr. Gold ordered X-rays of Plaintiff's lumbar spine due to Plaintiff's continuing complaints of low back pain. (R. 666). The X-rays revealed mild lumbar spondylosis. (Id.).

On April 10, 2012, Plaintiff presented to the PARS Pain Center for a pain management consultation. (R. 612). Plaintiff's diagnoses were listed as low back pain, lumbar arthropathy and a left L5-S1 herniated nucleus pulposus. (R. 615). Subsequently, it was recommended that Plaintiff undergo steroid injections in his back to treat his pain. (R. 608).

On May 17, 2012, Plaintiff was referred to Parkersburg Orthopedics after reporting left shoulder pain subsequent to a fall. (R. 472, 610). Plaintiff was diagnosed with a left rotator cuff tear and scheduled for surgery. (R. 468). On June 6, 2012, Plaintiff underwent an arthroscopic acromioplasty and mini open rotator cuff repair. (Id.).

From August through October of 2012, Plaintiff presented to the PARS Pain Center for steroid injections in his back. (R. 686-90). However, on November 15, 2012, Plaintiff "report[ed] 0 percent decrease in pain" after receiving the injections. (R. 696). Therefore, on December 3, 2012, Plaintiff underwent bilateral lumbar transforaminal

epidural steroid injections. (R. 700-01). On January 22, 2013, during a follow-up appointment, Plaintiff was ordered to participate in physical therapy. (R. 706).

On March 7, 2013, Plaintiff presented to Camden Clark Primary Care after establishing the facility as his primary care facility. (R. 865). Plaintiff's list of diagnoses included diabetes mellitus, hypertension, hypercholesterolemia and thyroid disease. (R. 869). Plaintiff's list of medications included: metformin for diabetes; Percocet and ibuprofen for pain; Valium and Cymbalta for anxiety; allopurinol for gout; hydrochlorothiazide and Prazosin for hypertension and levothyroxine for thyroid disease. (R. 866). At the end of the visit, Plaintiff was instructed to exercise "3 to 5 days per week [for] 30 mins per day," follow a healthy diet and lose weight. (R. 869).

On May 28, 2013, Plaintiff presented to PARS, complaining of worsening radiating neck pain. (R. 720). An MRI of Plaintiff's cervical spine was ordered, which revealed "some foraminal stenosis at C5-6, the level above his previous surgery." (R. 749). As a result, Plaintiff was diagnosed with cervical radiculopathy, cervical pain worsening and disc disorder of the cervical region. (R. 720).

On June 4, 2013, Plaintiff presented to Parkersburg Orthopedics, stating that he had fallen onto his left shoulder two months prior and had been experiencing increased left shoulder pain since that time. (R 923). An MRI of Plaintiff's right shoulder was ordered, the findings of which were "suspicious for possible retear of the infraspinatus tendon." (R. 601).

On August 27, 2013, Plaintiff returned to PARS, complaining of memory loss. (R. 736). An MRI of the brain previously ordered revealed no acute abnormalities and was "consistent with either normal cognition, mild cognitive impairment or early dementia."

(R. 721, 723, 740). Therefore, it was noted that "[p]otentially treatable causes of cognitive dysfunction should be excluded." (R. 740).

On September 19, 2013, Plaintiff again returned to PARS, complaining of continuing low back pain that radiated into his hips and calves. (R. 745). An MRI of Plaintiff's lumbar spine was ordered, after which Plaintiff was diagnosed with a herniated lumbar disc, low back pain, lumbosacral radiculitis and lumbar foraminal stenosis. (R. 751-52). After a discussion with a family nurse practitioner, Plaintiff stated that he "want[s] to consider surgery." (R. 749). Therefore, on November 15, 2013, a lumbar spine discogram was ordered to confirm the presence of an operative lesion. (R. 753, 757). On November 27, 2013, the discogram was performed and Plaintiff was diagnosed with displacement of a lumbar intervertebral disc without myelopathy. (R. 767, 771). It was noted that "[m]uch of [Plaintiff's] back pain may not be discogenic" and that Plaintiff should consider a stimulator instead of surgery. (R. 771). However, on December 17, 2013, Dr. Gold and Plaintiff agreed to schedule an L4-5, L5-S1 transforaminal lumbar interbody fusion. (R. 776).

On January 20, 2014,[8] Dr. Gold performed Plaintiff's back surgery. (R. 786). Plaintiff was hospitalized following the surgery but was discharged on January 24, 2014. (R. 972). Following his discharge, Plaintiff routinely presented to PARS for post-operative check-ups. (See, e.g., R. 796, 806, 814-18, 835-39). On February 12, 2014, X-rays of Plaintiff's lumbar spine were ordered, after which Plaintiff was diagnosed with mild lumbar spondylolisthesis in stable condition. (R. 806). On March 5, 2014, it was documented that Plaintiff "is pleased with the [surgery] results so far as he reports his

---

[8] On April 15, 2014, Plaintiff submitted a form entitled Claimant's Recent Medical Treatment. (R. 327-28). On this form, Plaintiff stated that, in addition to Dr. Gold, he was a patient of Dr. Rao and Sireesha Dasari, M.D., a family medicine physician, in 2014. (R. 327).

pain has improved significantly with the surgery, [although he] continues to have some bilateral greater troch pain with ambulation and left groin pain." (R. 814, 818). It was also documented that a physical therapy consultation was ordered. (R. 814, 817). Subsequently, after attending three physical therapy sessions, Plaintiff informed his physical therapist that "he is unable to walk for days post therapy." (R. 825). Therefore, despite being advised to return for further evaluation, Plaintiff called and cancelled his future therapy sessions. (Id.).

On June 12, 2014, Plaintiff presented to PARS for another check-up. (R. 385). During this visit, it was documented that:

> [Plaintiff] has made improvements with surgical intervention. He has improved about 50-75% with surgery. He denies any new or worsening . . . difficulty with gait, coordination . . . . [However, he] continues to complain of pain located in the lumbar spine and radiates into the bilateral hips and buttocks . . . .

(Id.). X-rays and an MRI of Plaintiff's lumbar spine were ordered. (R. 839). While the X-rays showed no acute changes, the MRI revealed:

- L4-5, L5-S1 levels: Interval left sided facetectomies and interbody fusions using pedicle screws, rods and interbody cages from left transforaminal approaches. No postoperative fluid collections or MRI evidence of complication. No residual, recurrent or new disc herniations. No central canal stenosis. There is a small amount of epidural granulation along the cage tracks. Slight increased right L5-S1 foraminal narrowing, now moderate.
- Probable minimal (1-2 mm) retrolisthesis of L3 on L4.

(R. 1006).

### 3. Medical Reports/Opinions

#### a. General Physical by James E. DeVos, M.D., September 20, 2010

On September 20, 2010, James E. DeVos, M.D., performed a Physical Examination of Plaintiff. (R. 364-66). Prior to the Physical Examination, Plaintiff informed Dr. DeVos that:

> I had a severe injury to my back when I fell 10 feet, 5 years ago and I was in a truck accident almost 3 months ago. I have severe pain in my low back and neck areas. I have had surgery to fuse vertebrae in my neck. I have had severe injury to [my left] ankle.

(R. 364). After the Physical Examination, Dr. DeVos diagnosed Plaintiff with two "[m]ajor impairments: low back pain and neck pain. (R. 365). Due to these impairments, Dr. DeVos opined that Plaintiff was unable to perform full-time work. (Id.). However, Dr. DeVos did not estimate how long Plaintiff would be unable to work full-time, stating it "[d]epends on pain control." (Id.).

#### b. Disability Determination Explanation by Fulvio Franyutti, M.D., January 8, 2013

On January 8, 2013, Fulvio Franyutti, M.D., and Philip E. Comer, Ph.D., state agency consultants, prepared the Disability Determination Explanation at the Initial Level (the "Initial Explanation"). (R. 73-84). In the Initial Explanation, the state agency consultants opined that Plaintiff suffers from non-severe anxiety disorders and severe disorders of the back, both discogenic and degenerative. (R. 77).

Dr. Franyutti completed a physical residual functional capacity ("RFC") assessment of Plaintiff. (R. 79-80). During this assessment, Dr. Franyutti found that, while Plaintiff possesses no manipulative, visual or communicative limitations, Plaintiff possesses exertional, postural and environmental limitations. (Id.). Regarding Plaintiff's

exertional limitations, Dr. Franyutti found that Plaintiff is able to: (1) occasionally lift and/or carry twenty pounds; (2) frequently lift and/or carry ten pounds; (3) stand and/or walk for approximately six hours in an eight-hour workday; (4) sit for approximately six hours in an eight-hour workday and (5) push and/or pull with no limitations. (R. 79). Regarding Plaintiff's postural limitations, Dr. Franyutti found that Plaintiff should never climb ladders/ropes/scaffolds but may occasionally climb ramps/stairs, balance, stoop, kneel, crouch and crawl. (Id.). Regarding Plaintiff's environmental limitations, Dr. Franyutti determined that, while Plaintiff need not avoid wetness, humidity and noise, he should avoid concentrated exposure to extreme heat, extreme cold, vibration, hazards such as machinery and heights and "[f]umes, odors, dusts, gases, poor ventilation, etc." (R. 80). After completing the RFC assessment, Dr. Franyutti determined that Plaintiff is able to perform light-exertional work. (R. 83).

Dr. Comer completed a Psychiatric Review Technique ("PRT") form and a Mental RFC Assessment of Plaintiff. (R. 77, 80-82). On the PRT form, Dr. Comer analyzed the degree of Plaintiff's functional limitations. (R. 77). Specifically, Dr. Comer rated Plaintiff's restriction of his activities of daily living as "[m]ild." (Id.). Dr. Comer further rated Plaintiff's difficulties in maintaining social functioning and in maintaining concentration, persistence and pace as "[m]oderate." (Id.). Finally, Dr. Comer rated Plaintiff's episodes of decompensation as "[o]ne or [t]wo." (Id.).

In the Mental RFC Assessment of Plaintiff, Dr. Comer determined that Plaintiff possess limitations in understanding and memory, sustained concentration and persistence, social interaction and adaptation. (R. 80-82). Regarding Plaintiff's understanding and memory limitations, Dr. Comer found that Plaintiff is not significantly

limited in his abilities to remember locations and work-like procedures and to understand and remember very short and simple instructions. (R. 81). Dr. Comer further found that Plaintiff is moderately limited in his ability understand and remember detailed instructions. (Id.).

Regarding Plaintiff's sustained concentration and persistence limitations, Dr. Comer found that Plaintiff is not significantly limited in his abilities to: (1) carry out very short and simple instructions; (2) maintain attention and concentration for extended periods; (3) sustain an ordinary routine without special supervision; (4) work in coordination with or in proximity to others without being distracted by them and (5) make simple work-related decisions. (Id.). Dr. Comer further found that Plaintiff is moderately limited in his abilities to: (1) carry out detailed instructions; (2) perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances and (3) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Id.).

Regarding Plaintiff's social interaction limitations, Dr. Comer determined that there is "[n]o evidence of limitation" in Plaintiff's ability to accept instructions and respond appropriately to criticism from supervisors. (R. 81-82). Additionally, Dr. Comer determined that Plaintiff is not significantly limited in his abilities to: (1) ask simple questions or request assistance; (2) get along with coworkers or peers without distracting them or exhibiting behavioral extremes and (3) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (Id.). However, Dr.

Comer further determined that Plaintiff is moderately limited in his ability to interact appropriately with the general public. (R. 81).

Finally, regarding Plaintiff's adaptation limitations, Dr. Comer found that Plaintiff is not significantly limited in his abilities to: (1) respond appropriately to changes in the work setting; (2) be aware of normal hazards and take appropriate precautions and (3) travel in unfamiliar places or use public transportation. (R. 82). Dr. Comer further found that Plaintiff is moderately limited in his ability to respond appropriately to changes in the work setting. (Id.). After performing the Mental RFC Assessment, Dr. Comer opined that Plaintiff retains the mental RFC to perform "simple routine work like activity in a work environment that does not require intense or sustained concentration and that has limited social interaction requirements." (Id.).

### c. Disability Determination Explanation by A. Rafael Gomez, M.D., April 5, 2013

On April 5, 2013, A. Rafael Gomez, M.D., a state agency medical consultant, prepared the Disability Determination Explanation at the Reconsideration level (the "Reconsideration Explanation"). (R. 115-30). In the Reconsideration Explanation, Dr. Gomez reviewed the physical RFC assessment from the Initial Explanation and affirmed that Plaintiff is capable of performing light work. (See id.).

Also in the Reconsideration Explanation, James W. Bartee, Ph.D., a state agency psychological consultant, reviewed Dr. Comer's Psychiatric Review Technique form from the Initial Explanation. (R. 106). After reviewing the form, Dr. Bartee declared that he was "in general accord" with Dr. Comer's findings. (Id.). Dr. Bartee did not perform a mental RFC assessment of Plaintiff. (R. 115-30).

**C. Testimonial Evidence**

During the administrative hearing on September 17, 2014, Plaintiff divulged his relevant personal facts and work history. Plaintiff lives alone in a mobile home on his father's land. (R. 36). His most recent job was a self-employed construction subcontractor. (R. 36-37). As a construction subcontractor, "[t]he last thing that [he did] was metal stud framing in condos, some houses, in Florida." (R. 37). However, Plaintiff was injured, and temporarily ceased working. (Id.). After recovering, he resumed "work[ ]⁹ and made about $5,000.00 one year, and the next year, it . . . [went down to] $1,600.00." (Id.). Subsequently, Plaintiff "couldn't [work] at all." (Id.).

Plaintiff testified that he suffers from multiple ailments. For example, Plaintiff testified that he suffers from a neck impairment. (R. 39-40). Plaintiff underwent neck surgery in September of 2010, in which "[the surgeons] stretched [his] right vocal cord and . . . tendon in [his] neck to where . . . they don't work anymore." (R. 39). He states that, if he talks for two hours, his voice "goes to a whisper." (R. 40). Since the surgery, Plaintiff has experienced pain and pressure in his neck and "ha[s] to move it a lot." (R. 39). He describes the pain as constant and states that the range of motion of his neck is decreased. (R. 40). He declares that his health care providers are "thinking about another surgery." (R. 39).

Plaintiff testified that he suffers from back pain and difficulty balancing. (R. 41-45). Regarding his back pain, Plaintiff testified that he has undergone radiofrequency ablation for his back pain but that it "did not help at all." (R. 45). Nevertheless Plaintiff stated that "we're going to try it again." (Id.). Regarding his difficulty balancing, Plaintiff

⁹ Plaintiff testified that he would mow grass and do "just a little bit of construction." (R. 38).

testified that his legs "don't work right," "like they're not getting  . . . [the] right signal from my brain." (R. 41). Plaintiff stated that he has been prescribed a cane for short distances and a walker for long distances. (R. 41-42). He declares that he does not drive but that his father drives him if needed. (R. 44).

He testified that he has right hand difficulties. (Id.). He explains that "all of the tendons that hold the bones [in his right hand] together are missing . . . they broke and then dissolved." (Id.). As a result, Plaintiff experiences difficulty gripping objects with his right hand and pain that interferes with his sleep. (Id.). He states that he will require surgery on his hand in the future. (R. 38). Finally, Plaintiff testified that he suffers from an old heel injury, headaches, short-term memory and concentration issues and knee impairments. (R. 41, 45-47).

**D.    Vocational Evidence**

**1.  Vocational Testimony**

Nancy Shapero, an impartial vocational expert, also testified during the administrative hearing. (R. 47-51). Initially, Ms. Shapero testified regarding the characteristics of Plaintiff's past relevant work. (R. 44). Specifically, Ms. Shapero testified that Plaintiff has worked as a construction worker, which she characterized as a heavy-exertional position. (R. 48).

After Ms. Shapero described Plaintiff's past relevant work, the ALJ presented a hypothetical question for Ms. Shapero's consideration. (Id.). In this hypothetical, the ALJ asked Ms. Shapero to:

> [A]ssume [an individual] of [Plaintiff's] age, education, and work
> background. Such a person is limited to light work, defined in the
> regulations. He is unable to climb ropes, ladders, or scaffolds. Other
> postural activities are limited to frequent. There should be only occasional

overhead reaching of the left upper extremity, and only frequent reaching in all other directions with the left upper extremity. There should be only occasional forceful gripping or twisting with the . . . right hand, and only frequent handling and fingering with the right hand. There should be no work at unprotected heights. There should be no exposure to vibrations or extremes of cold. Work is restricted to uninvolved three and four-step tasks only.

(Id.). The ALJ then asked Ms. Shapero whether the hypothetical individual could perform Plaintiff's past work as a construction worker, to which Ms. Shapero responded in the negative. (Id.). However, Ms. Shapero further responded that such an individual could perform a light, unskilled position such as a customer service representative, stock checker or sorter. (R. 49). The ALJ then repeated the hypothetical but changed the light work limitation to sedentary work. (Id.). Ms. Shapero stated that such an individual could work as a surveillance systems monitor, order clerk or inspector, all unskilled positions. (Id.). Finally, the ALJ repeated the hypothetical but added the following limitations to the individual: (1) must use a cane for all ambulation; (2) is expected to be absent for the aggregate of two to three days per month on average and (3) is expected to be off task on the average of sixty to ninety minutes per day or for unscheduled breaks. (R. 50). Ms. Shapero declared that such an individual would not be employable with the addition of any of the limitations. (Id.).

Plaintiff's counsel, Ms. Costelloe, also presented a question for Ms. Shapero's consideration during the administrative hearing. (R. 51). Specifically, Ms. Costelloe asked whether an individual would be employable in any of the jobs that Ms. Shapero previously identified if the individual could not "master the job within the normal training period" but would "require[ ] additional supervision

or training." (Id.). Ms. Shapero responded that such an individual would not be considered employable for any of the previously identified jobs. (Id.).

### 2. Disability Reports and Work History Reports

On November 8, 2012, Plaintiff submitted a Disability Report. (R. 276-88). In this report, Plaintiff indicated that the following ailments limit his ability to work: (1) injuries in his lower back, neck, shoulder and left foot; (2) memory loss and (3) depression, anxiety and nightmares. (R. 277). He further indicated that he stopped working on July 15, 2008, "[b]ecause of [his] conditions." (Id.). Finally, he indicated that he is prescribed the following medications: (1) albuterol for his asthma (controlled); (2) allopurinol for excess uric acid (controlled); (3) Cymbalta for his depression; (4) Dexilant for his acid reflux (controlled); (5) hydrochlorothiazide for "fluid;" (6) hydrocodone, ibuprofen and Percocet for pain; (7) levothyroxine for his thyroid (controlled); (8) lisinopril for his blood pressure (controlled); (9) metformin for his diabetes (controlled); (10) prazosin for nightmares; (11) temazepam for a sleep aid and (12) Valium for anxiety. (R. 280).

After Plaintiff submitted the Disability Report, Plaintiff's attorney, Ms. Dils, submitted two Disability Report-Appeal forms. (R. 302-05, 309-12). On February 25, 2013, Ms. Dils reported:

> Allegations: injuries in lower back, neck, left shoulder and the left foot (rolled truck in 2008 or 2009)[,] surgery in 2010. memory issues, depression, anxiety and nightmares, he has limited mobility of both hands, he has numbness in both hands, numbness in both arms as well, he burnt his right arm and did not even feel it. Vocal cord issues stemming from surgery on neck. he has difficulty swallowing and some times speaking without getting choked. type II diabetes. gout and kidney stones, asthma, acid reflux, degenerative joint disease of the cervical spine, has had 2 surger[ies] on right foot, it is fused to the ankle. It has limited mobility. He had shots, burst nerves etc[.] and nothing is working for the pain. High blood pressure. [ ]He must lay down most of the day. He cannot stand for longer than 5 minutes, he cannot sit for longer th[an] 10 minutes before he

18

must change positions, he must use a cane to walk. He is prescribed a
walker to assist him with walking longer distances, such as walking from
one end of Walmart to the other. He can only sleep on his side. He cannot
sleep on his back. He cannot bend over to pick up things. He doesn't care
to go around others due to the depression. He has nightmares about the
pain he is experiencing. (he dreams he's being beat up, punching block
walls etc.)[.] He is [being] treat[ed] for this. . . .

(R. 305). On May 10, 2013, Ms. Dils reported that Plaintiff's condition had changed. (R.

309). Specifically, Ms. Dils stated that Plaintiff is now experiencing increased back, neck

and shoulder pain and increased anxiety and depressive symptoms. (Id.). She

estimated that these changes occurred on April 1, 2013. (Id.). Due to these changes,

Ms. Dils declared that Plaintiff now requires assistance completing personal tasks,

household tasks, getting out of bed and standing from a seated position. (R. 311). Ms.

Dils further declared that Plaintiff requires a cane or walker to stand up and to walk any

amount of distance.[10] (Id.).

On August 20, 2014, Plaintiff, with the help of his counsel, completed a Work

History Report. (R. 331-38). In this report, Plaintiff indicates that he has worked in wood

framing, stud framing, wood construction and, most recently, construction/mowing. (R.

331). When describing the duties of his most recent position, Plaintiff stated that he

assisted with "various small construction projects" and occasionally mowed lawns. (R.

335). He explained that the position required him to use machines, tools and equipment.

---

[10] Ms. Dils also updated Plaintiff's list of medications. (R. 312). However, Plaintiff
updated this list again on April 15, 2014, and once more on September 12, 2014 (R. 330, 339-
40). On a form entitled Claimant's Medications, Plaintiff's most recent updated list of
medications, Plaintiff declared that he takes the following medications: (1) levothyroxine for
hypothyroidism; (2) diazepam for anxiety; (3) oxycodone for pain; (4) Cymbalta for depression;
(5) hydrochlorothiazide and metoprolol for high blood pressure; (6) fenofibrate for high
cholesterol; (7) temazepam for insomnia; (8) metformin for diabetes mellitus; (9) omeprazole for
acid reflux; (10) cyclobenzaprine for cramps in his back; (11) an albuterol inhaler for asthma and
(12) fluticasone nasal spray and diphenhydramine for allergies. (R. 339-40).

(Id.). He further explained that he would frequently lift twenty-five pounds and that the heaviest weight he lifted was "100 lbs. or more." (Id.).

## E. Lifestyle Evidence

### 1. Adult Function Report, December 22, 2012

On December 22, 2012, Plaintiff, with the help of Victoria Moss, his ex-wife, completed an Adult Function Report. (R. 289-96, 301). In this report, Plaintiff states that he is unable to work due to the following:

> Pain neck and lower back pain and numbness in arms, hand, legs, and feet[.] Poor balance[,] walk [with] a cane or walker[.] Problems sitting[,] standing[,] laying or walking. Sleep very little at night[.] Memory loss. Trouble lifting[,] tak[ing] ca[re] of self.

(R. 289).

Plaintiff discloses that he is limited in some ways but not in others. In several activities, Plaintiff requires no or minimal assistance. For example, Plaintiff is able to perform his own personal care. (R. 290). He prepares his own meals and eats fast food or microwavable food. (Id.). He is able to mow his lawn with the use of a riding mower. (R. 291). He is able to ambulate with a cane or walker and operate a motor vehicle independently. (R. 292). He is able to shop in grocery stores. (Id.). Finally, he is able to count change, although he is unable to pay bills, handle a savings account or use a checkbook/money orders because he has "no money[,] only . . . food stamps." (Id.).

While Plaintiff is able to perform some activities, he describes how others prove more difficult due to his impairments. Plaintiff's impairments affect his abilities to: lift, squat, bend, stand, reach, walk, sit, kneel, talk, hear, climb stairs, see, memorize information, complete tasks, concentrate, understand information, follow written and spoken instructions, use his hands and get along with others. (R. 294). Plaintiff explains

that he is limited to walking fifty yards before needing three to five minutes to rest. (<u>Id.</u>). Plaintiff further explains that he is only able to pay attention for "maybe" five minutes and experiences difficulty handling stress and changes to his routine. (R. 294-95). He is no longer able to perform his former hobbies, which include golfing, hiking and hunting. (R. 293).

Finally, Plaintiff details his routine activities. Upon awakening in the morning, Plaintiff will stay in bed some days and do "nothing" and other days will get out of bed "for a few hours." (R. 290). When he is not in bed, he will "bathe[,] [and] wait aw[hile, then] shave[,] [and] wait [a]while." (<u>Id.</u>). Occasionally, he leaves the house for a doctor's appointment. (<u>Id.</u>). He denies partaking in any social activities. (R. 293). At night, he occasionally experiences difficulty sleeping because he "ha[s] to keep changing positions." (R. 290).

### 2. Personal Pain Questionnaire, December 27, 2012

On December 27, 2012, Plaintiff submitted a Personal Pain Questionnaire. (R. 297-01). In this questionnaire, Plaintiff declares that he suffers from lower back pain, neck pain and left leg and foot pain. (R.297-99). Regarding his lower back pain, Plaintiff characterizes the pain as aching, stabbing, cramping, throbbing and continuous in nature. (R. 297). He explains that the pain ranges from six to ten on a scale of one through ten. (<u>Id.</u>). He states that nothing fully relieves the pain but that his medications "take[ ] the edge off." (<u>Id.</u>). He further states that his medications include Percocet, which he describes as "[n]ever" effective, and ibuprofen, which he describes as "[s]ometimes" effective. (R. 298).

Regarding his neck pain, Plaintiff characterizes the pain as aching, stabbing, burning, stinging, cramping, throbbing, crushing and continuous in nature. (Id.). Plaintiff explains that, in addition to pain, he feels pressure in his neck and that he experiences difficulty moving his head up and down due to the pain. (R. 298-99). He states that his medications "help[ ]" the pain "some." (R. 299). He further states that his pain medication includes oxycodone and Valium, which he declares are "[s]ometimes effective." (Id.).

Regarding his left leg and foot pain, Plaintiff characterizes the pain as aching, burning, stinging, cramping, throbbing and continuous in nature. (R. 299-00). He explains that walking, squatting and cold weather worsen the pain and that his pain medications relieve the pain. (R. 300). He states that his pain medications consist of oxycodone, ibuprofen and Valium, which he describes as "[s]ometimes" effective. (Id.). At the end of the Personal Pain Questionnaire, Plaintiff declares that, in addition to his lower back, neck and left leg and foot pain, he suffers from bilateral shoulder pain. (R. 301).

## IV.     THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

> [The] individual . . . [must have a] physical or mental impairment or impairments . . . of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. . . . '[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §§ 423(d)(2)(A) & 1382c(a)(3)(B). The Social Security Administration uses

the following five-step sequential evaluation process to determine whether a claimant is

disabled:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement [of twelve months] . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.
>
> (iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.
>
> [Before the fourth step, [your RFC] . . . is evaluated "based on all the relevant medical and other evidence in your case record . . . ."]
>
> (iv) At the fourth step, we consider our assessment of your [RFC] and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.
>
> (v) At the fifth and last step, we consider our assessment of your [RFC] and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520 & 416.920. In steps one through four, the burden is on the

claimant to prove that he or she is disabled and that, as a result of the disability, he or

she is unable to engage in any gainful employment. Richardson v. Califano, 574 F.2d

802, 804 (4th Cir. 1978). Once the claimant so proves, the burden of proof shifts to the

Commissioner at step five to demonstrate that jobs exist in the national economy that

the claimant is capable of performing. Hicks v. Gardner, 393 F.2d 299, 301 (4th Cir.

1968). If the claimant is determined to be disabled or not disabled during any of the five steps, the process will not proceed to the next step. 20 C.F.R. §§ 404.1520 & 416.920.

## V. ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the Social Security Administration's five-step sequential evaluation process, the ALJ found that:

1.  The claimant meets the insured status requirements of the Social Security Act through March 31, 2012.

2.  The claimant has not engaged in substantial gainful activity since February 1, 2010, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.  Since February 1, 2010, the claimant has [had] the following severe impairments: degenerative disc disease [of the] cervical spine status post fusion; degenerative disc disease [of the] lumbar spine with radiculopathy status post fusion; carpal tunnel syndrome (CTS) [of the] right wrist; and left rotator cuff tear status post surgical repair with acromioplasty (20 CFR 404.1520(c) and 416.920(c)).

4.  Since February 1, 2010, the claimant [has not had] an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that[,] since February 1, 2010, the claimant has [had] the [RFC] to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: (1) unable to climb ladders, ropes, and scaffolds; (2) all other postural activities limited to frequently; (3) only occasional overhead reaching with left upper extremity and frequent reaching in all other directions with left upper extremity; (4) occasional forceful gripping/twisting with right hand and frequent handling/fingering with right hand; (5) no unprotected heights; (6) no exposure to vibrations or extremes of cold; and (7) work is involved with 3-4 step tasks only.

6.  Since February 1, 2010, the claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on February 1, 1966[,] and was 44 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (see SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform since February 1, 2010 (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.   The claimant has not been under a disability, as defined in the Social Security Act, since February 1, 2010, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. 13-18).

## VI.    DISCUSSION

## A.    Contentions of the Parties

In his Motion for Summary Judgment, Plaintiff contends that the Commissioner's decision is contrary to the law and is not supported by substantial evidence. (Pl.'s Mot. at 1). Specifically, Plaintiff contends that the ALJ: (1) erred at step three when he summarily determined that Plaintiff does not meet Listing 1.04A; (2) erred when he determined that Plaintiff possesses the RFC to perform light work and (3) improperly evaluated Plaintiff's credibility. (Mem. in Supp. of Pl.'s Mot. for J. on the Pleadings ("Pl.'s Br.") at 4, ECF No. 13). Plaintiff requests that the Court reverse the Commissioner's decision and remand the case for an award of benefits or, alternatively, remand the case for further proceedings. (Id. at 15).

Alternatively, Defendant contends in her Motion for Summary Judgment that the Commissioner's decision is supported by substantial evidence. (Def.'s Mot. at 1). To counter Plaintiff's arguments, Defendant contends that substantial evidence supports: (1) the ALJ's step three findings; (2) the RFC for light work and (3) the ALJ's credibility findings. (Def.'s Br. in Supp. of her Mot. for Summ. J. ("Def.'s Br.") at 6, ECF No. 16-1). Defendant requests that the Court affirm the Commissioner's decision. (Def.'s Mot. at 1).

**B.    Scope of Review**

In reviewing an administrative finding of no disability, the scope of review is limited to determining whether the ALJ applied the proper legal standards and whether the ALJ's factual findings are supported by substantial evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). A "factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). Likewise, a factual finding by the ALJ is not binding if it is not supported by substantial evidence. Richardson v. Perales, 402 U.S. 389, 401 (1971). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Id. (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). When determining whether substantial evidence exists, a court

must "not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ's]." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005).

## C. Analysis of the Administrative Law Judge's Decision

### 1. Whether the ALJ Erred in Determining that Plaintiff Failed to Meet the Requirements of Listing 1.04A

Plaintiff argues that the ALJ erred when he determined that Plaintiff failed to meet the requirements of Listing 1.04A. (Pl.'s Br. at 5). More specifically, Plaintiff argues that the ALJ erred in providing "no rationale" for his determination that Plaintiff did not meet the requirements of Listing 1.04A. (Id.). Defendant contends that substantial evidence supports the ALJ's step three finding. (Def.'s Br. at 6).

At step three of the sequential evaluation process, a claimant bears the burden of proving that his or her medical impairments meet or equal the severity of an impairment recorded in the "Listing of Impairments," located at 20 C.F.R. Part 404, Subpt. P, App. 1 (2015). Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). If a claimant meets this burden, then the claimant "establishes a prima facie case of disability." Id. Listing 1.04, the contested listing in this case, applies to claims involving "[d]isorders of the spine." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00K. Specifically, the disorders of the spine must "result in limitations because of distortion of the bony and ligamentous architecture of the spine and [the resulting] associated impingement o[f] nerve roots . . . or spinal cord." Id. Therefore, under this listing, a claimant must establish:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, [or] motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, [a] positive straight-leg raising test (sitting and supine); or

B. Spinal arachnoiditis . . . or

C. Lumbar spinal stenosis resulting in pseudoclaudication[.]

Id. at § 1.04. When detailing whether a claimant has met the requirements of a listing, an ALJ must "compare the [claimant's] actual symptoms to the requirements of [the] relevant listed impairments in more than a 'summary way.'" Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir.1986). This Court has remanded cases in which the ALJ simply recited the elements of a listing and concluded that the claimant had failed to meet the elements, without offering any additional analysis. See,e.g., Fraley v. Astrue, No. 5:07CV141, 2009 WL 577261, at *25 (N.D. W.Va. Mar. 5, 2009) (citing Warner v. Barnhart, Civil Action No. 1:04–cv–8, Docket No. 18 at 7–9, 11 (Final Order of Stamp, J., filed Mar. 29, 2005)) ("The [ALJ] is required to give more than a mere conclusory analysis of the plaintiff's impairments pursuant to the regulatory listings.").

In the present case, the undersigned finds that the ALJ erred at step three of the sequential evaluation process. At step three, the ALJ determined that "the objective criteria of Listing 1.04[11] . . . is not satisfied." (R. 14). The ALJ reasoned that:

[T]here is no evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss, and positive straight-leg raising test. Also, the record does not document spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication. [Plaintiff] is able to ambulate effectively.

[11] In his opinion, the ALJ collectively considered Listing 1.04A-C. However, Plaintiff is only contesting the ALJ's consideration of Listing 1.04A, the requirements of which he believes he meets.

(Id.).

The ALJ's reasoning is insufficient. The ALJ was required to compare Plaintiff's actual symptoms to the requirements of Listing 1.04 in more than a summary way. Instead, the ALJ merely listed the requirements of Listing 1.04 and stated that Plaintiff had not satisfied them. The only fact from the record that the ALJ explicitly discussed was Plaintiff's ability to ambulate effectively.

However, the record reflects that Plaintiff suffers from spinal disorders that could potentially meet or equal Listing 1.04A, of which the ALJ was well aware. At step two of the sequential evaluation process, the ALJ concluded that Plaintiff suffers from severe degenerative disc disease of the cervical and lumbar spines. At step four, the ALJ noted that Plaintiff has also been diagnosed with radiculopathy and has undergone an anterior cervical discectomy and fusion, as well as a transforaminal lumbar interbody fusion. (R. 15-16). The ALJ further noted that, since his surgeries, Plaintiff has been diagnosed with spinal stenosis. (R. 16). Finally, despite his statement in his step three reasoning that "[t]here is no evidence of . . . positive straight leg raising test," the ALJ conflictingly noted later in his opinion that "there is documentation of a positive straight leg raise test." (Id.). Therefore, Plaintiff presented evidence relevant to the ALJ's step three analysis and the ALJ was required to explain why the evidence Plaintiff presented failed to meet or medically equal the severity of Listing 1.04A in more than a conclusory manner.

The ALJ's bare conclusory statements at step three preclude meaningful judicial review. See Bentley v. Comm'r of Soc. Sec., No. 1:13CV163, 2014 WL

906587 (N.D. W. Va. Mar. 7, 2014) (stating that the ALJ's step three finding

constituted a bare conclusion beyond meaningful judicial review). Consequently,

the matter must be remanded.[12] Therefore, the matter must be remanded for

further proceedings. On remand, the ALJ shall fully develop the record and

provide further discussion and analysis of whether Plaintiff's impairments meet or

medically equal Listing 1.04A.

### 2. Whether the ALJ Erred in Determining Plaintiff's RFC

Plaintiff argues that the ALJ erred in finding that Plaintiff possesses the RFC to

perform light work. (Pl.'s Br. at 10). Specifically, Plaintiff argues that the ALJ erroneously

determined that Plaintiff does not require a cane to ambulate and, because he requires

a cane, he is incapable of performing light work. (Id. at 10-12). Defendant contends that

the ALJ's RFC determination is supported by substantial evidence. (Def.'s Br. at 7).

Prior to step four of the sequential evaluation process, the ALJ must determine

the claimant's RFC. 20 C.F.R. § 404.1520. The "ultimate responsibility for determining

a[n] . . . RFC is reserved for the ALJ, as the finder of fact." Farnsworth v. Astrue, 604 F.

Supp. 2d 828, 835 (N.D. W. Va. 2009). The RFC is what a claimant "can still do despite

[his or her] limitations." 20 C.F.R. § 404.1545(a)(1) (2012). More specifically, the RFC is

"[a] medical assessment of what an individual can do in a work setting in spite of the

functional limitations and environmental restrictions imposed by all of his or her

medically determinable impairment(s)." Dunn v. Colvin, 607 F. App'x. 264, 272 (4th Cir.

2015). When determining an RFC, the ALJ initially "assess[es] the nature and extent of

---

[12] Plaintiff further argues that the ALJ erred in failing to consider any listing besides Listing 1.04. (Pl.'s Br. at 5). However, Plaintiff offers no other relevant listings. Plaintiff also offers no authority stating that an ALJ must consider more than one listing. Therefore, Plaintiff's argument lacks merit and the ALJ will not be required to consider any additional listings on remand.

[the claimant's] physical limitations." 20 C.F.R. § 404.1545(b). Depending on those limitations, the claimant may then be found capable of performing sedentary, light, medium, heavy or very heavy work. 20 C.F.R. § 404.1567 (2015). Light work involves:

> [L]ifting no more than [twenty] pounds at a time with frequent lifting or carrying of objects weighing up to [ten] pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. § 404.1567(b).

In the present case, the undersigned finds that the ALJ did not err in determining that Plaintiff is capable of performing light-exertional work. Plaintiff argues that the ALJ erroneously determined that Plaintiff does not require a cane to ambulate. (Pl.'s at 10-12). In his written opinion, the ALJ "decline[d] to find that [Plaintiff's use of a cane to ambulate] was medically necessary." (R. 15). The ALJ reasoned that:

> [P]laintiff's representative argued strenuously that a cane was medically necessary because it was prescribed in 2011. It may have been prescribed, but there are no physician notes from the applicable time period indicating that it is medically necessary. Moreover, it is not clear from [the record] as to which care provider may have prescribed the cane. No reference to a cane is made in the PARS [Neurological Associates] records from the applicable time period . . . . Although there is mention . . . that [Plaintiff] treated with a Dr. Rao, . . . his records were not provided. . . . [R]ecords from the applicable time period also do not contain evidence of a physical examination that would support a finding that [Plaintiff] required a cane to ambulate.

(Id.). Plaintiff does not dispute that "there is no[ ] . . . statement from a provider that [Plaintiff's] cane is medically necessary." (Pl.'s Br. at 11). Instead, Plaintiff argues that "the medical necessity of [a] cane is clearly implied by [Plaintiff's] records." (Id.) (stating that Plaintiff's medical records indicate that he possesses gait abnormalities).

The undersigned disagrees. Social Security Ruling 96-9P provides that:

> To find that a hand-held assistive device is medically required, *there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed* (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information).

SSR 96-9P, 1996 WL 374185, at *7 (July 2, 1996) (emphasis added). Although Plaintiff argues that his medical records imply that a cane is necessary because some records indicate that he possesses gait abnormalities,[13] other medical records reveal that Plaintiff walks with a steady or stable gait. (<u>See, e.g.</u>, R. 563, 579-80, 903-05, 913-14). Because Plaintiff has not provided any medical documentation indicating that one of his health care providers ordered him to walk with a cane, let alone records establishing the circumstances for which a cane is needed, he has failed to meet his burden of proving that the cane is medically necessary.[14] <u>Richardson v. Califano</u>, 574 F.2d 802, 804 (4th Cir. 1978) (stating that the burden is on the claimant in steps one through four); <u>see also</u> <u>Sayles v. Astrue</u>, No. 6:11-CV-2285-AKK, 2012 WL 3506248, at *4 (N.D. Ala. Aug. 13, 2012) (stating that the plaintiff's use of a cane was not medically necessary because there was no medical evidence showing that the plaintiff required an assistive device to walk, lift or carry objects, despite plaintiff's testimony that he had been prescribed the cane).

---

[13] Plaintiff also points to customer invoices in which Plaintiff was charged for a cane on November 4, 2011, and a walker on July 31, 2012. (R. 1010-11). However, these invoices fail to establish that the assistive devices are medically necessary or the circumstances for which they were to be used.

[14] Plaintiff picks apart the ALJ's reasoning for finding that his use of a cane is not medically necessary, contending that "the ALJ's assertion that there was no mention of a cane in [Plaintiff's] earlier medical records from PARS and Pennsboro is incorrect and/or misleading" and that the ALJ erred in holding his lack of emergency treatment for falls against him. (Pl.'s Br. at 12). However, the undersigned finds that these arguments are moot because Plaintiff failed to meet his burden of providing evidence establishing that his use of a cane is medically necessary.

To the extent that Plaintiff argues that, even if a cane is not medically necessary, there was "unrebutted evidence that [Plaintiff] regularly uses a cane to ambulate" and that, therefore, he is precluded from performing all light work, Pl.'s Br. at 10, such argument is without merit. See Sayles, 2012 WL 3506248, at *4 (stating that the plaintiff's argument that his use of a cane, which was found to not be medically necessary, precluded all light work was speculative and failed to demonstrate that the ALJ erred). If a cane is not medically necessary, then "it cannot be considered an exertional limitation that reduce[s] [the claimant's] ability to work."[15] Carreon v. Massanari, 51 F. App'x 571, 575 (6th Cir. 2002). Consequently, the ALJ's RFC determination is supported by substantial evidence.

### 3. Whether the ALJ Properly Evaluated Plaintiff's Credibility

Plaintiff argues that the ALJ erred when determining that Plaintiff is "not credible" regarding his subjective complaints. (Pl.'s Br. at 13). Defendant argues that the ALJ properly assessed Plaintiff's credibility and that the ALJ's credibility determination is supported by substantial evidence. (Def.'s Br. at 9).

"[T]he determination of whether a person is disabled by pain or other symptoms is a two-step process." See Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996); see also 20 C.F.R. § 404.1529(c)(1) (2011); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). First, the ALJ must expressly consider whether the claimant has demonstrated, through objective medical evidence, that a medical impairment exists that is capable of causing the degree and type of pain alleged. See Craig, 76 F.3d at 594. Second, the ALJ must consider the credibility of the claimant's subjective allegations of pain in light of the

---

[15] Plaintiff appears to merely disagree with the ALJ's determination that Plaintiff is capable of performing light work. However, this Court will not undertake to reweigh conflicting evidence or substitute its judgment for that of the ALJ's.

entire record. Id.

Social Security Ruling 96-7p[16] sets out several factors, in addition to the objective medical evidence, for an ALJ to consider when assessing the credibility of a claimant's subjective symptoms and limitations, including:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for [fifteen] to [twenty] minutes every hour, or sleeping on a board), and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). An ALJ need not document specific findings as to each factor. Wolfe v. Colvin, No. 3:14-CV-4, 2015 WL 401013, at *4 (N.D. W. Va. Jan. 28, 2015). However, the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that

_____

[16] On March 16, 2016, SSR 96-7p was superseded by SSR 16-3p. Nevertheless, because SSR 16-3p was not issued until after the date of the ALJ's decision, the undersigned will review whether the ALJ's decision comports with SSR 96-7p, the ruling that was applicable on the date of the ALJ's decision.

weight." SSR 96-7p, 1996 WL 374186 at *2. Because the ALJ has the opportunity to observe the demeanor of the claimant, the ALJ's observations concerning the claimant's credibility are given great weight. Shively, 739 F.2d at 989-90. This Court has determined that "[a]n ALJ's credibility determinations are 'virtually unreviewable' by this Court." Ryan v. Astrue, No. 5:09CV55, 2011 WL 541125, at *3 (N.D. W. Va. Feb. 8, 2011). If the ALJ meets his or her basic duty of explanation, then "an ALJ's credibility determination [will be reversed] only if the claimant can show [that] it was 'patently wrong.'" Sencindiver v. Astrue, No. 3:08-CV-178, 2010 WL 446174, at *33 (N.D. W. Va. Feb. 3, 2010) (quoting Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000)).

In the present case, the undersigned finds that the ALJ properly followed the two-step process when determining that Plaintiff is "not credible." (R. 12). Initially, the ALJ determined that Plaintiff had proved that he suffers from medical impairments that "could reasonably be expected to cause the alleged symptoms." (Id.). Then, after examining the factors outlined in SSR 96-7p, the ALJ further determined that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible" in light of the entire record.[17] (Id.).

### i. Plaintiff's Daily Activities

The ALJ briefly considered Plaintiff's daily activities (factor one) when making his credibility determination. (R. 15). While the ALJ did not explicitly detail all of Plaintiff's daily activities, he noted that Plaintiff "walks with a cane or a walker" and that Plaintiff alleges difficulty performing daily activities such as standing, walking and climbing stairs. (Id.). The ALJ further noted that Plaintiff alleges that he is able to walk fifty yards

---

[17] Plaintiff argues that "the ALJ did not make clear the weight given" to the "portion of [Plaintiff's] . . . testimony [that] was summarized in the [ALJ's] decision." (Pl.'s Br. at 15). The undersigned disagrees. The ALJ clearly determined that the testimony was not credible.

before needing to stop and rest. (Id.).

### ii.    Plaintiff's Pain and Other Symptoms

The ALJ also reviewed the location, duration, frequency and intensity of Plaintiff's pain and other symptoms (factor two) and the factors that precipitate and aggravate those symptoms (factor three). Regarding Plaintiff's symptoms, the ALJ noted that Plaintiff's complaints include neck and back pain, right wrist pain, poor balance and "legs [that] do not work right." (R. 15-16). The ALJ also noted that Plaintiff alleges that his neck pain is severe in nature and "lasts all day" and that Plaintiff's right wrist pain is "appear[s] to be chronic in nature."  (Id.). Regarding factors that precipitate/aggravate Plaintiff's symptoms, the ALJ documented that falling and landing on his right wrist in June of 2013 exacerbated Plaintiff's right wrist pain and that activity, particularly prolonged activity, exacerbates his symptoms. (See id.).

### iii.    Plaintiff's Medications

The ALJ generally discussed the medication that Plaintiff is prescribed for his symptoms (factor four). For example, the ALJ noted that Plaintiff "was receiving pain medications from providers in West Virginia and Florida at the same time in 2011, which detracts from [Plaintiff's] overall credibility regarding his symptoms and limitations." (R. 15).

### iv.    Other Treatment and Measures Used to Relieve Symptoms

Next, the ALJ reviewed treatment other than medication that Plaintiff has received for relief of his symptoms (factor five) as well as measures Plaintiff uses to relieve his symptoms on her own (factor six). Regarding treatment other than medication that Plaintiff has received for his symptoms, the ALJ documented that,

"[a]lthough [Plaintiff initially] reported . . . that he [was scheduled for] . . . right hand surgery[,] . . . [he s]ubsequently . . . reported that he did not have right hand surgery because he deferred it to have surgery on his back." (R. 16). The ALJ further documented that Plaintiff has undergone a left shoulder arthroscopy, a carpal tunnel release [of his right wrist], a C6-C7 anterior cervical discectomy and fusion and "an L4-L5 and L5-S1 transforaminal lumbar interbody fusion." (R. 15-16). Finally, the ALJ documented that, despite Plaintiff's allegations of falls, "no documentation of emergency treatment for traumatic injury" exists in the record.[18] (R. 15). As for measures Plaintiff uses to relieve his symptoms on his own, the ALJ noted that Plaintiff walks with a cane or walker and attempts to limit his activity. (See R. 15).

### v. Substantial Evidence Supports the ALJ's Credibility Determination

After a careful review of the ALJ's decision and the evidence of record, the undersigned finds that, while not extensive, the ALJ's credibility determination is sufficiently specific to make clear his reasoning in finding Plaintiff not entirely credible. Thus, the burden was on Plaintiff to show that the ALJ's credibility determination is patently wrong. Plaintiff failed to meet this burden. Consequently, the undersigned accords the ALJ's credibility determination the great weight to which it is entitled.

### VII.   RECOMMENDATION

For the reasons herein stated, I find that the Commissioner erred at step three of the sequential evaluation process when assessing Plaintiff's applications for DIB and SSI benefits. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary

---

[18] Plaintiff argues that the ALJ erred in holding his lack of emergency treatment against him. (Pl.'s Br. at 14). However, even if the ALJ committed an error, such error is harmless because it was not the only factor relied upon by the ALJ in assessing Plaintiff's credibility.

Judgment (ECF No. 12) be **GRANTED**, Defendant's Motion for Summary Judgment (ECF No. 16) be **DENIED** and the action be **REMANDED** to the Commissioner for further action in accordance with this Report and Recommendation. On remand, the ALJ shall fully develop the record and provide further discussion and analysis of whether Plaintiff's impairments meet or medically equal Listing 1.04A.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objections are made and the basis for such objections. A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, Jr., Senior United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841, 845-48 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140, 155 (1985).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this 26th day of May, 2017.

ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE